**Juan G. MORALES, Plaintiff-Appellee,**

v.

**Wilbur J. SCHMIDT, Defendant-Appellant.**

**No. 72-1373.**

United States Court of Appeals, Seventh Circuit.

Argued July 19, 1972.

Decided Jan. 17, 1973.

As amended March 5, 1973.

Opinion on Rehearing En Banc March 22, 1974.
See 494 F.2d 85.

---

Robert W. Warren, Atty. Gen., Robert D. Repasky, Mary V. Bowman, Asst. Attys. Gen., Madison, Wis., for defendant-appellant.

Paul A. Hahn, Madison, Wis., for plaintiff-appellee.

Anthony J. Theodore, Corrections Legal Services Program, Madison, Wis., amicus curiae.

Before CUMMINGS, PELL, and STEVENS, Circuit Judges.

PELL, Circuit Judge.

This is an appeal from the entry of a preliminary injunction by the District Court for the Western District of Wisconsin enjoining Wilbur J. Schmidt, the Secretary of the Department of Health and Social Services of the State of Wisconsin, and his agents from restricting correspondence between Juan Morales and his wife's sister.[1] According to Morales's complaint, defendant-appellant Schmidt has general supervision over the rulemaking policies of the state prisons and is "directly liable for the conduct and actions of his agents therein." At the time of the filing of the complaint, Morales was an inmate of the Wisconsin State Prison at Waupun.

As an initial matter, we must dispose of a mootness question. Morales was convicted of having violated the Uniform Narcotics Drug Addiction Act and was sentenced to a term of not more than ten years. On March 27, 1972, before the district court entered its order in this case, Morales was released on parole. The petition of amicus curiae, Corrections Legal Services Program, suggests that the case is therefore moot. We agree with the appellant and appellee that we have before us a live controversy. The department which defendant Schmidt heads has responsibility for the entire correctional system of the State of Wisconsin, including the administration of parole and probation matters. Pursuant to the sentence imposed on Morales, Schmidt will have legal custody of the plaintiff, although a parolee, for six more years and has authority to impose restrictions upon him. In his response to the amicus curiae petition, Secretary Schmidt stated that he has refrained from preventing Morales from communicating with his sister-in-law solely because of the duty to comply with the district court's injunction. We further note that there is always the possibility that Morales during his period of parole will violate the terms of his conditional release and thus be returned to prison. In light of these circumstances, we find that the change in plaintiff's status does not alter the central issue.

I

The parties are in agreement about the facts. On November 28 or 29, 1970,

---

1. The district court's opinion is found at 340 F.Supp. 544 (1972).

Morales wrote a letter to his wife's sister, Kathleen Steffes, who was on the prison's list of approved correspondents. In the letter Morales mentioned that he was the father of a child by Steffes and stated that he hoped to continue his relationship with mother and son in the future. At the time the letter was written, the plaintiff's wife was apparently unaware of the relationship between her sister and Morales, including the fact that her husband had fathered Steffes's illegitimate child.

Prison administrators intercepted and read the letter and then routed it to Morales's prison social worker, who refused to mail it to Steffes. On December 22, 1970, he discussed with Morales the letter as well as Morales's continued correspondence with his sister-in-law. After consulting with prison officials, the social worker told Morales that Steffes was being placed on the list of denied correspondents-visitors and that she would be notified of this decision.

Both Morales and Steffes were advised that the decision would be re-evaluated if they could provide additional information.

The prison administrators based their actions on their opinion that it would be inappropriate to permit Morales to correspond with a woman with whom he had had an illicit sexual relationship, particularly since they had reason to believe that he intended to continue the relationship upon his release from prison although he also intended to live with his wife and their children.

Neither Morales nor Steffes made further efforts to justify to prison authorities their correspondence. In January 1971, Morales filed the present Section 1983 action, 42 U.S.C. § 1983, in the federal district court, alleging that the prison officials' actions in refusing to allow the letter of November 28, 1970, to be sent to Kathleen Steffes and in refusing to permit him to correspond with her violated his rights under the First, Fifth, Ninth, and Fourteenth Amendments. Condemning the administrators' actions as "arbitrary, capricious and unreasonable," he sought a permanent injunction against the defendant and his agents to bar them from depriving him of the use of the mails "to communicate with [plaintiff's] relatives and family." Morales also alleged irreparable injury and moved for a temporary restraining order.

The district court entered an order directing the Secretary of Health and Social Services to show cause why the requested order should not be granted. The Secretary then moved for summary judgment upon affidavits.

On April 6, 1972, the court dismissed the motion for summary judgment and entered the preliminary injunction challenged here. In reaching its decision, the court reasoned as follows: (1) freedom to use the mails is a First Amendment freedom; (2) someone not convicted of a crime would be free to correspond with his wife's sister whether or not he had been sexually intimate with her; (3) the interest of a non-convict in corresponding by mail is a "fundamental" interest; (4) "when the government undertakes to deny this freedom to a member of the class of persons who have been convicted of crime, while granting it to members of a class of persons who have not been convicted of crime, the burden is upon the [State] to show a compelling governmental interest in this differential in treatment," 340 F.Supp. at 554–555; and (5) the Government's interests in the maintenance of internal prison discipline and in the rehabilitation of Morales are not so compelling as to permit their vindication by interference with a right secured to plaintiff by the First and Fourteenth Amendments.

## II

The Constitution provides no clear answer to federal courts seeking to determine the civil rights of state prisoners. The variety of views expressed by the courts when resolving challenges by prisoners to the constitutionality of prison rules reflects the ambiguous mandate

of the Bill of Rights and the Thirteenth and Fourteenth Amendments when construed together.

The Thirteenth Amendment, if read literally, suggests that the States may treat their prisoners as slaves: "Neither slavery nor involuntary servitude, *except as a punishment for crime whereof the party shall have been duly convicted,* shall exist within the United States, or any place subject to their jurisdiction."[2] However, by emphasizing the applicability to state prisoners of the Fourteenth Amendment, which now incorporates most of the Bill of Rights including the Eighth Amendment's prohibition of "cruel and unusual punishments,"[3] courts in recent years have moderated the harsh implications of the Thirteenth

Amendment. But the tension remains between the view that a prisoner enjoys many constitutional rights, which rights can be limited only to the extent necessary for the maintenance of a person's status as prisoner (or parolee), and the view that a prisoner has only a few rudimentary rights and must accept whatever regulations and restrictions prison administrators and State law deem essential to a correctional system. Even the most "liberal" opinions acknowledge that although a convicted person is not a slave neither is he a "freeman."

Thus, we agree with the district court that state prisoners' suits present exceedingly perplexing problems for the federal courts.[4] We must not shirk our

2. See generally Wheeler, Toward a Theory of Limited Punishment: An Examination of the Eighth Amendment, 24 Stan. L.Rev. 838 (1972); Comment, The Cruel and Unusual Punishment Clause and the Substantive Criminal Law, 79 Harv.L. Rev. 635 (1966). Also see Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910); Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958); Sellars v. Beto, 409 U.S. 968, 93 S.Ct. 279, 34 L.Ed.2d 233 (1972) (opinion of Mr. Justice Douglas, dissenting from denial of petition for writ of certiorari). Cf. Ruffin v. Commonwealth, 62 Va. (21 Grat.) 790, 796 (1871), wherein the Supreme Court of Virginia stated:

> "It is essential to the safety of society, that those who violate its criminal laws should suffer punishment. . . . [The penitentiary inmate] is . . . the slave of the State. . . . The bill of rights is a declaration of general principles to govern a society of freemen, and not of convicted felons and men civilly dead. Such men have some rights it is true, such as the law in its benignity accords to them, but not the rights of freemen."

This passage apparently represents the common law's view of the status of the offender. In 1970, a federal district court observed: "Our enlightened concern for individual human rights as it has penetrated prison compounds has taken us a long way from the judicial attitudes of the past as illustrated by . . . Ruffin v. Commonwealth. . . ." Palmigiano v. Travisono, 317 F.Supp. 776, 785 (D.R.I.1970).

3. In Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), the Supreme Court applied the Eighth Amendment to the States through the Fourteenth Amendment.

4. The complexities of nonfrivolous civil rights suits by prisoners have inhibited few legal commentators. See, e. g., Hirschkop, The Rights of Prisoners, in The Rights of Americans 451 (N. Dorsen ed. 1971); Bass, Correcting the Correctional System: A Responsibility of the Legal Profession, 5 Clearinghouse Rev. 125 (July 1971); Hirschkop & Millemann, The Unconstitutionality of Prison Life, 55 U.Va.L.Rev. 795 (1969); Hollen, Emerging Prisoners' Rights, 33 Ohio St.L.J. 1 (1972); Jacob, Prison Discipline and Inmates Rights, 5 Harv. Civ.Rights—Civ.Liv.L.Rev. 227 (1970); Singer, Censorship of Prisoners' Mail and the Constitution, 56 A.B.A.J. 1051 (1970); Symposium, Prisoners' Rights and the Correctional System: The Legal Controversy and Problems of Interpretation, 16 Vill.L.Rev. 1029 (1971); Turner, Establishing the Rule of Law in Prisons: A Manual for Prisoner Rights Litigation, 23 Stan.L.Rev. 473 (1971); Comment, Prisoner Correspondence: An Appraisal of the Judicial Refusal to Abolish Banishment as a Form of Punishment, 62 J.Crim.L.C. & P.S. 40 (1971); Note, Constitutional Rights of Prisoners: The Developing Law, 110 U.Pa.L.Rev. 985 (1962); Note, The Right of Expression in Prison, 40 U.So.Cal.L.Rev. 407 (1967); Note, Enforcement of Prison Discipline and Its Effect Upon the Constitutional Rights of Those Imprisoned,

duty to protect an individual's rights, yet we must respect the rights and interests of the States. In a symposium on prison reform and "prisoners' rights," the Dean of the University of Virginia Law School articulated well the major questions:

"What is the proper function of the courts, the legislatures and executive? What are the limits of the wisdom and power of each? What must be left to administrators for determination? What are the opportunities of each of these institutions for information gathering, for enforcement, and for promulgation? . . . How much liberty is compatible with the order necessary in any kind of institutional confinement—a closed society—where the principal concern of each inmate is to get out? . . . What are the programs which in fact change the character of human beings? . . . [W]hat kinds of things does the Constitution require [in a prison setting?]" [5]

The Fourteenth Amendment states in part: "nor shall any State deprive any person of life, liberty, or property, without due process of law." Morales does not maintain that his conviction and sentence were accomplished without due process. But this does not establish what liberties remained to him once he was found guilty according to law. The relatively few cases in which prisoners have contested prison officials' refusal to permit correspondence or visiting rights with specific persons are of limited aid.[6] Factually closest is Fussa v. Taylor, 168 F.Supp. 302 (M.D.Pa.1958), where the court upheld the warden's decision. However, there the forbidden female correspondent was deeply involved in narcotics, was herself an inmate, and was but the most recent in a series of paramours the petitioner had had. In Corby v. Conboy, 457 F.2d 251 (2d Cir. 1972), decided after the Second Circuit's seminal opinion in Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971), cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L. Ed.2d 740 (1972), a Second Circuit pan-

8 Vill.L.Rev. 379 (1963); Comment, Prison Mail Censorship and the First Amendment, 81 Yale L.J. 87 (1971); Comment, Beyond the Ken of the Courts: A Critique of Judicial Refusal to Review Complaints of Convicts, 72 Yale L.J. 506 (1963).

5. Paulsen, Prison Reform in the Future—The Trend Toward Expansion of Prisoners' Rights, 16 Vill.L.Rev. 1029, 1082, 1083, 1084 (1971). See also the Second Circuit's expression of misgivings about "judicial activism" in Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971), cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972). The famous dicta in Price v. Johnston, 334 U.S. 266, 285, 68 S. Ct. 1049, 92 L.Ed. 1356 (1948), and Coffin v. Reichard, 143 F.2d 443, 445 (6th Cir. 1944), cert. denied, 325 U.S. 887, 65 S.Ct. 1568, 89 L.Ed. 2001 (1945), implicitly raise these same questions.

6. We note the issues that the present case does *not* raise. Freedom of the press or the public's right to know is not at stake here, e. g., Nolan v. Fitzpatrick, 451 F.2d 545 (1st Cir. 1971). The prohibited communication was between an inmate (now parolee) and the mother of his child, not between an inmate and his attorney, or

the courts, or appropriate state officials regarding the legality of his conviction or the conditions of his incarceration. Courts now regard the latter kind of communications as *sui generis*. Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971), cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972). See also Smith v. Robbins, 328 F.Supp. 162 (D.Me. 1971), aff'd *on this issue*, 454 F.2d 696 (1st Cir. 1972). The present case is also distinguishable from those suits questioning the practice of opening and reading or censoring (in the sense of deleting certain sentences) mail by prison authorities or their limiting the number of letters permitted to a prisoner. The federal courts have reached varying conclusions about the legality of such actions. See, e. g., Sostre v. McGinnis, *supra*, 442 F.2d at 199–201 (dicta); Lee v. Tahash, 352 F.2d 970 (8th Cir. 1965); Jansson v. Grysen, No. G–130–71 C.A. (W.D.Mich., June 5, 1972); Palmigiano v. Travisono, 317 F.Supp. 776 (D.R.I.1970). Finally, Morales does not contend that prison officials restricted his correspondence "privileges" in retaliation for his engaging in protected activity, e. g., Sellars v. Beto, 345 F.Supp. 499 (S.D.Tex.1972).

el held that the contention that prison administrators had violated the prisoner's civil rights by refusing to mail several letters to the petitioner's family because they contained prison news or constituted "begging" adequately stated a claim under Section 1983. Another Second Circuit decision, Wilkinson v. Skinner, 462 F.2d 670 (2d Cir. 1972), affirmed the dismissal of a prisoner's civil rights complaint because the issues raised therein had been mooted by amended regulations relating to censorship of prison correspondence. The new regulations, which allowed prison authorities to refuse to mail outgoing letters or to accept incoming mail "where it is apparent that there exists a clear and present danger to the jail or penitentiary," provided a sufficiently precise delineation of the boundaries of the protection against censorship. Accordingly, the court concluded that "[a]bsent a showing that appellant's correspondence with his mother . . . would pose a clear and present threat to prison discipline or security, presumably such correspondence will not be further interfered with by the appellees," 462 F.2d at 672–673.[7]

Unlike *Wilkinson*, our case does not involve a regulation that embodies a familiar legal standard. Pursuant to stat-

utory authority, Wisconsin prison officials had promulgated correspondence rules, and defendant Schmidt on appeal states that his agents, in terminating correspondence between Morales and his sister-in-law, acted under them. (See Appendix to this opinion.) However, the regulations provided no standard comparable to the one approved in *Wilkinson*. Furthermore, the enabling legislation specifies no guidelines for the drafting of rules governing correspondence. The formulation of parole regulations apparently is also left to the discretion of correctional administrators. The district court therefore did not discuss particular written regulations but tackled directly the problem of determining the appropriate standard for testing whether the Constitution forbids a State to regulate the life of a convicted person in a certain manner. Its choice of standard was intertwined with its analysis of the constitutionality of a State's limiting communications by a person convicted of a crime under circumstances where the State could not so limit a non-convict's communications.

It is to this portion of the district court's opinion, its adoption of the "compelling state interest" standard, that appellant Schmidt takes greatest exception. Schmidt fears that if we uphold the ap-

---

7. Other cases contesting the constitutionality of prison authorities' refusal to permit a prisoner to correspond with or see certain persons are either factually too removed from Morales's situation or are inadequately reasoned. Wilkerson v. Warden of U. S. Reformatory, El Reno, Okla., 465 F.2d 956 (10th Cir. 1972) (prison officials' refusal to permit correspondence between plaintiff inmate and another prisoner confined in a different prison was not unreasonable) ; Walker v. Pate, 356 F.2d 502 (7th Cir. 1966), cert. denied, 384 U.S. 966, 86 S.Ct. 1598, 16 L.Ed.2d 678 (prisoner's wife had a criminal record ; however, daughter allowed to visit) ; McCloskey v. Maryland, 337 F.2d 72 (4th Cir. 1964) (prisoner wished assistance in promoting his anti-Semitic beliefs) ; Numer v. Miller, 165 F.2d 986 (9th Cir. 1948) (prisoner not permitted to mail some lesson sheets for a correspondence English course ; decision provides no analysis) ; Wells v. McGinnis,

344 F.Supp. 594 (S.D.N.Y.1972) (court dismissed, for failure to state claim upon which relief could be granted, prisoner's complaint protesting official's refusal to mail letter to family wherein prisoner complained of illegal treatment ; court cited Sostre v. McGinnis, *supra*, but ignored Corby v. Conboy, 457 F.2d 251 (2d Cir. 1972), described in text of our opinion) ; Rowland v. Wolff, 336 F.Supp. 257 (D.Neb.1971) (in denying visitation by prisoner's sisters, warden had sufficient factual basis for suspecting the women of smuggling in a pistol) ; In re Leamer, 322 F.Supp. 578 (W.D.Pa.1971) (petitioner gave no reason for writing to various individuals who had served on the jury which had convicted him many years before) ; Shaffer v. Jennings, 314 F. Supp. 588 (E.D.Pa.1970) (court summarily stated that prisoner had no constitutional right to write or receive letters from his family during time he was at medical center).

plicability of the test, few prison regulations will be able to withstand constitutional attack. Prisoners allegedly will contest every disciplinary measure, and prison administrators will be unable to command the adherence to rules which allows the correctional system to function smoothly.

The compelling state interest standard is one of several "tests" courts use to determine whether governmental curbs on a citizen's civil liberties are justifiable. See, e. g., Bates v. City of Little Rock, 361 U.S. 516, 524, 80 S.Ct. 412, 417, 4 L.Ed.2d 480 (1960). "Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling." As the opinion of the district court below illustrates, how stringent a justification a State must offer depends in part, under current doctrine, on the nature of the right invaded. Courts commonly reserve the compelling state interest standard for impingements on sensitive areas of liberty, that is, interests of a citizen which courts deem "fundamental."

Like many other judicial standards, "compelling state interest" is not a precise concept. Some judges, for example, seem to equate it with the "less drastic means" test. Others, like Mr. Justice White, rephrase it as a curtailment "reasonably necessary for the effectuation of a legitimate and substantial state interest, and not arbitrary or capricious in application. . . ." Griswold v. Connecticut, 381 U.S. 479, 502, 504, 85 S.Ct. 1678, 1692, 14 L.Ed.2d 510 (1965) (White, J., concurring in the judgment

finding Connecticut's statutory ban of contraceptives unconstitutional). *Cf.* Branzburg v. Hayes, 408 U.S. 665, 700–708, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

The district court in the case before us decided that correspondence by mail is a "fundamental" interest. *Cf.* Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965), especially the concurring opinion of Mr. Justice Brennan, 381 U.S. at 308, 85 S.Ct. 1493. Hence, the district court concluded that the compelling state interest standard was the appropriate test for judging the constitutionality of governmental restrictions on correspondence by mail. The district court noted that the equal protection clause is clearly applicable to intra-prison classes. The court, however, then rejected the "unarticulated but potent" view that the equal protection clause has no applicability where the classes involved consist of prisoners and non-prisoners. The court adopted the thesis that those convicted of crime should continue "to share with the general population the full latent protection of the Fourteenth Amendment." 340 F.Supp. at 549.

In so holding, the district court did not condemn the establishment of the two classes as "inherently suspect." Instead, it ruled that when a State seeks to restrain a fundamental interest of the members of one class, it bears the burden of showing a compelling interest in the differential in treatment. The State may not merely show that the differentiation was not arbitrary or unreasonable.[8]

---

8. The district court is not alone in applying the "compelling state interest" standard to restraints of prisoners' "rights." See, e. g., Barnett v. Rodgers, 133 U.S. App.D.C. 296, 410 F.2d 995 (1969) (refusal of prison officials to provide a pork-free diet for Black Muslims). *Cf.* Jackson v. Godwin, 400 F.2d 529 (5th Cir. 1968) (right to receive "Negro newspapers and magazines"; equal protection and First Amendment analyses) ; Palmigiano v. Travisono, 317 F.Supp. 776 (D.R.I. 1970) (censorship and inspection of mail) ; Carothers v. Follette, 314 F.Supp.

1014 (S.D.N.Y.1970) (prisoner improperly punished for writing letters to his parents in which he criticized prison officials). Both *Palmigiano* and *Carothers* apply an amalgam of standards. *But see* Wilson v. Prasse, 463 F.2d 109 (3d Cir. 1972) (validity of rules and regulations governing the practice of the Muslim religion by black inmates) ; Sharp v. Sigler, 408 F.2d 966, 971 (8th Cir. 1969) ("The standard is one of reasonableness") ; Seale v. Manson, 326 F.Supp. 1375, 1379 (D.Conn. 1971) ("[A] court should not be reluctant to strike down a prison regulation if it is

■ We disagree that the equal protection clause mandates the elimination of the distinction between the two classes here. The Supreme Court has indicated that the constitutional limitations on governmental actions differ depending on the role in which the government is acting in a particular case. This is so despite the fact that each situation might involve the same constitutional interest of the affected individuals. See, e. g., Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L. Ed.2d 811 (1968). Cf. the Supreme Court's statement in Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed. 2d 484 (1972): "Revocation [of parole] deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent· on observance of special parole restrictions. . . . The State has found the parolee guilty of a crime against the people. That finding justifies imposing extensive restrictions on the individual's liberty. . . ." 408 U.S. at 480, 483, 92 S.Ct. at 2600, 2601. The Morrissey Court did not pass on the constitutionality of the restrictions placed on parolees; however, in describing the "traditional" conditions of parole, including the prohibition of association or correspondence with certain categories of undesirable persons, the Court implicitly acknowledged the propriety of these conditions or, at least, the authority of the States to limit a parolee's activities substantially beyond the ordinary restrictions imposed by law on an individual citizen. As we suggested before, the Constitution gives the States considerable leeway in deciding how to treat persons convicted of violating State law. We hold that the Constitution does not require a State to show a compelling interest when it seeks to restrict a prisoner's or parolee's associations or written communications with persons who are not judges, lawyers, or governmental officials. (See footnote 6, supra.)

Defendant Schmidt apparently opposes any judicial inquiry into the reasonableness of specific restrictions concerning a particular felon. He deplores the erosion of the "hands-off" doctrine, which provided that a court should not examine the legitimacy of prison rules or the reasonableness of their application in a particular situation, areas entrusted to the discretion of prison officials.

Secretary Schmidt also urges us to find that the kind of restriction imposed on Morales is "inherent in the concept of punishment for a crime." Although some courts have referred to conditions "inherent" in a system of punishment, we think that such an inquiry is unwise. It would plunge us into a philosophical debate far removed from our proper judicial function of interpreting and applying the Constitution. Further, a decision based on our understanding of "punishment" would merely reflect our personal predilection for certain social and moral policies, e. g., retribution or utilitarianism.

In our opinion, courts have been wisely hesitant about involving themselves too deeply in the day-to-day operations of a state penal system. Prison administrators necessarily must have freedom to exercise discretion in the execution of their duties. However, to allow prison administrators to determine the constitutional rights of a convicted person would be to abdicate our responsibilities. Cf. Johnson v. Avery, 393 U.S. 483, 486, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); Sobell v. Reed, 327 F.Supp. 1294, 1302 (S.D.N.Y.1971). After all, the maintenance of a correctional system is state action. "Federal courts sit not to supervise prisons but to enforce the constitutional rights of all 'persons' which in-

unreasonable or arbitrary . . . or not reasonably related to the needs of penal administration."). Cf. Cooper v. Pate, 382 F.2d 518, 521 (7th Cir. 1967)

("Courts will closely scrutinize the reasonableness of any restriction imposed on a prisoner's activity in the exercise of his religion. . . . ").

clude prisoners." Cruz v. Beto, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972). Recent decisions of the United States Supreme Court, as well as of several courts of appeals, clearly establish that cursory disposition of unfrivolous claims by prisoners no longer suffices. In evaluating a prisoner's suit, the Wisconsin Supreme Court recently stated: "The courts cannot upon a hands-off doctrine exercise 'abstention' when the constitutionality of the administration's act is at issue." State ex rel. Thomas v. State, 55 Wis.2d 343, 357, 198 N.W.2d 675, 683 (1972).

The appropriate standard by which to judge the constitutionality of the kind of restriction the defendant wishes to impose in this case is the usual one for analyzing State action, namely, whether the action contemplated bears a rational relationship to or is reasonably necessary for the advancement of a justifiable purpose of the State. Pursuant to this standard, a district court should scrutinize closely the justifications offered by the State for the limitation. Its review must "be more than an obeisance to a warden's asserted expertise." Spaeth, The Courts' Responsibility for Prison Reform, 16 Vill.L. Rev. 1029, 1031, 1037 (1971). In State ex rel. Thomas v. State, *supra*, the Wisconsin Supreme Court interpreted the statute under which defendant Schmidt claims his agents acted.[9] The court indicated that it would condemn the statute as unconstitutional if it prohibited totally communication by inmates:

"This statute may be read to require reasonable regulations which effectuate legitimate administrative objectives without infringing the first amendment rights of prisoners. The statute certainly does not grant all the powers of an absolute censor to the department of health and social services." 55 Wis.2d at 357, 198 N.W.2d at 682-683.

*Cf.* Hyland v. Procunier, 311 F.Supp. 749, 750 (N.D.Cal.1970):

"[I]t is not only the apparent abridgement of first amendment rights which concerns the Court. California as well as federal law has imposed the due process rule of reasonableness upon the State's discretion in granting or withholding 'privileges' from prisoners, parolees, and probationers. . . . The defendants herein have made no showing that the condition imposed on plaintiff's parole is in any way related to the valid ends of California's rehabilitation system."

Our adoption of the rational relationship standard is consistent with the Wisconsin Supreme Court's opinion in State ex rel. Thomas v. State, *supra*. The appellant there, an inmate of the Wisconsin State Prison at Waupun, sought, *inter alia*, an injunction restraining interference by prison officials with his attempt to communicate with the Veterans Administration. The court reversed the dismissal of the prisoner's suit, citing two theories: the right to petition for redress of grievances and the First Amendment's free-speech guarantee. We note that the court's free speech discussion was an alternative ground for its decision. Further, the court's primary aim was to emphasize the State's obligation to justify its actions under any of the accepted standards of review, 55 Wis.2d at 353, 356–357, 198 N.W.2d at 682–683. We do not read the opinion as committing the Wisconsin Supreme court to any one particular standard.

The district court's granting of a preliminary injunction was based upon the "compelling state interest" standard which we hold not to be applicable in the situation before the court. The record is insufficient for a determination of the question of whether the State's proposed restriction is justified under the rational relationship standard, the test

9. Wis.Stat. § 53.09: " . . . Communication shall not be allowed between inmates and any person outside the prison except as prescribed by the prison regulations." (See Appendix to this opinion.)

which we hold is applicable here. We accordingly reverse and remand for further proceedings not inconsistent with this opinion. Upon remand, it will be appropriate to consider, *inter alia,* whether the prohibition of Morales's communicating and associating with his sister-in-law is rationally related to the advancement of some legitimate purpose of the State such as the rehabilitation of Morales.

Reversed and remanded.

## APPENDIX TO THE COURT'S OPINION

Wis.Stat. § 53.09 states:

> "*Labor and Communications.* Inmates shall be employed as provided in chapter 56. Communication shall not be allowed between inmates, and any person outside the prison except as prescribed by the prison regulations."

Pursuant to this authority, the Division of Corrections promulgated regulations governing the delivery and dispatch of prisoner correspondence. The administrative regulations covering mail privileges, revised as of February, 1971, provide in pertinent part:

> "(a) *Approved Lists.* Each inmate shall be permitted to correspond with approved persons named on the correspondence list. . . . The list of approved correspondents may be changed or revised with approval of the appropriate officer.
>
> (b) *Limitations.* The number of outgoing letters permitted each week shall be specified by the warden or superintendent. The outgoing correspondence privilege may be withdrawn or restricted as a disciplinary or security measure.
>
> (c) *Mail Inspection.* All incoming and outgoing mail for inmates shall be subject to institution inspection.
> . . .

At the discretion of the warden, superintendent, or designated official, the delivery or dispatch of any inmate correspondence, with the exceptions noted [letters to certain state officials and to judges], may be withheld for reasons of propriety, security or the welfare of the institution or inmate. Such correspondence shall be disposed of as the warden or superintendent shall direct, having in mind the best interests of the inmate and the institution. . . ."

In November 1971 and March 1972, certain changes were made in the correspondence regulations. Approved and denied correspondence lists were continued, but limitations on the number of correspondents and the number of letters permitted were removed. Further, except for prisoners in disciplinary segregation, "all outgoing mail [that is not visibly unusual because of size, etc.] shall be sealed by the individual and shall not be read by the institution staff." Also, "[a]ll incoming mail will be opened and inspected for contraband but the letter shall not be read." The new regulations state that an institution warden or superintendent may suspend privileges (a) for violators or correspondence rules; (b) for any person whose behavior or attitude poses a threat to the safety and welfare of the institution; and (c) at a time of general threat to the overall security of the institution.

STEVENS, Circuit Judge (dissenting).

The question presented by this interlocutory appeal is whether, pending the conclusion of the trial, plaintiff should be prevented from corresponding with his wife's sister.[1] The answer to that question depends on whether the record presented to the district court by de-

---

1. The order entered on April 6, 1972, from which defendant appealed, reads:

   "Upon the basis of the entire record, IT IS ORDERED that the defendant's motion for summary judgment is denied.

   "IT IS FURTHER ORDERED that the defendant, his agents and those acting in concert with him, are preliminarily enjoined, until further order of the court, from preventing the plaintiff from corresponding with his wife's sister."

fendant adequately justified his subordinates' refusal to permit any communication between those two persons.

Defendant explained the prohibition as based on (1) § 53.09 of the Wisconsin statutes;[2] (2) written regulations in the Wisconsin Division of Correction's Manual of Adult Institution Procedures (revised January, 1971);[3] and (3) the contents of a letter dated November 29, 1970, from Morales to Steffes "which was confiscated as evidence of an illicit affair which plaintiff obviously desired to keep from his wife."[4] The decision to place Steffes on "plaintiff's deny list was based on our recent awareness that he had fathered her child, Joseph, and that his wife Sandra, her sister, was unaware of this information."[5]

The scholarly opinions which Judge Pell and Judge Doyle have written convincingly demonstrate that the legal issues engendered by this pathetic family situation are of far-reaching import. I cannot accept Judge Doyle's broad conclusion that the fact of conviction is not itself a sufficient basis for some differential in the treatment of the fundamental interests of those who have, as opposed to those who have not, been convicted of crime. In my opinion his reliance on the Equal Protection Clause as requiring the state to justify any such differential by a "compelling state interest" is misplaced. Nevertheless, I am persuaded that his disposition of the specific issue raised by the response to the plaintiff's application for a temporary injunction was correct.

Before discussing each of the three aspects of defendant's justification, a preliminary comment on the state of the record, and some of its deficiencies, is appropriate. It does not contain the precise regulations which were in effect when Steffes was placed on the "deny list"; indeed, it does not even contain the regulations as revised in January, 1971. The relevant regulations "as revised" in February, 1971, are before us. Since Defendant's brief implies that they are controlling, I make that assumption.

The record contains only fragments of information about plaintiff's rather complex family relationships. In addition to his wife and mother (with whom he corresponds in Spanish), his family includes at least one brother, three half brothers and three half sisters. Apparently he married Sandra in 1966, not long after moving to Milwaukee. Shortly thereafter he initiated proceedings to adopt her illegitimate daughters. On at least one occasion during his incarceration in 1968 her prolonged failure to correspond or to visit him caused him to enlist the assistance of the Correctional Department to inquire about the welfare of his children. I do not find that the record discloses the age of plaintiff's illegitimate son, Joseph, or whether his affair with Steffes preceded or followed his marriage to Sandra. Portions of his letter to Steffes evidence a genuine concern about the welfare of Joseph.[6]

Addresses in the file indicate that his wife and sister-in-law were neighbors as

---

2. "Communication shall not be allowed between inmates and any person outside the prison except as prescribed by the prison regulations."

3. See page 1, paragraph 4, of Exhibit A attached to the affidavit in support of defendant's response to the order to show cause.

4. *Ibid.*, paragraph 5.

5. *Id.*, page 2, paragraph 8.

6. "Hope you received the money to buy my son, Joseph, a nice Xmas gift. It wasn't much, but at least this coming Xmas my son will be getting a small gift from his true father.

\* \* \* \* \*

"You say in your letter that you have a part-time job and that Joseph is placed in a child care center, as to why you place him there I don't know . . . . I'm sure that Sandra will take good care of him, why not give it a try. I rather have Joseph spend a half day with his brother and sister instead of being in a child care center where no one will show him love. So think about it and let me know."

well as sisters. Whether the family situation is such that a complete termination of any association between plaintiff and Steffes would be a desirable or feasible condition to parole is not indicated. There is nothing in the record to indicate that the relationship between Morales and Steffes had any connection with his possession of heroin, for which he was convicted.

When issue was joined in the district court, the record contained little information about plaintiff's prospects for rehabilitation.[7] It is reasonable to infer that Steffes was placed on plaintiff's "deny list" for reasons related to rehabilitation, but that conclusion is not expressly articulated in the record; nor is there any evidence that correction officials considered less drastic alternatives, such as censorship of plaintiff's correspondence with Steffes, before banning all communication between them.

### I.

The record would clearly be adequate to support defendant's position if § 53.-09 of the Wisconsin statutes could be enforced literally. For that statute may be read to authorize a total prohibition against any communication by an in-

mate. The Wisconsin Supreme Court has held, however, that the statute must be read more narrowly because such a total prohibition would be unconstitutional. It has construed § 53.09 "to require reasonable regulations which effectuate legitimate administrative objectives without infringing the First Amendment rights of prisoners." State ex rel. Thomas v. State, 55 Wis.2d 343, 357, 198 N.W.2d 675, 683.

The State Supreme Court's conclusion that a prisoner's claimed right to communicate raises First Amendment issues is plainly correct. Whether we view the issue from the standpoint of the prisoner's right to communicate with others, or from the standpoint of society's right to know what is happening within a penal institution, it is perfectly clear that traditional First Amendment interests are at stake.[8] It is equally clear that plaintiff's incarceration has not completely extinguished his First Amendment rights.[9]

The case does not merely involve a prisoner's right to receive incoming mail which, unlike outgoing mail, may contain contraband. Nor does it involve mere inspection or censorship of outgoing mail. It involves a total prohibition

---

7. The petition of amicus curiae suggesting that the appeal be dismissed as moot advises us that plaintiff was paroled on March 27, 1972, but it does not appear that this development was called to Judge Doyle's attention before he made his ruling on April 6, 1972.

8. Before a democratic society can effectuate drastic institutional changes, the community at large must be informed about the need for change. That there is inadequate public awareness of the nature of our penal system, and that the system as a whole needs to be changed dramatically, are propositions which correctional officials are not likely to challenge. (See, e. g., Reducing Crime and Assuring Justice, A Statement by the Research and Policy Committee, June 1972, Committee for Economic Development, at p. 40: "The entire correctional system is failing and in need of drastic reconstruction.") If the reasons for our faith in the principles embodied in the First Amendment are valid, it is not unreasonable to infer

that there is a causal connection between those two propositions.

9. Wilkinson v. Skinner, 462 F.2d 670 (2d Cir. 1972); Nolan v. Fitzpatrick, 451 F.2d 545 (1st Cir. 1971). It is noteworthy that Pierce v. La Vallee, 293 F.2d 233 (2d Cir. 1961), which was decided on First Amendment rather than Equal Protection grounds, was cited with approval in Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030. See Cruz v. Beto, 405 U.S. 319, 321–322, 92 S.Ct. 1079, 31 L.Ed.2d 263. Although Mr. Justice Rehnquist found no impermissible impairment of petitioner Cruz's religious freedom, his analysis, like that of the majority, recognized that Cruz's conviction and incarceration had not resulted in a total deprivation of the aspects of liberty protected by the First Amendment. See 405 U.S. at 324, 92 S.Ct. 1079. See, also, the cases cited by Judge Mansfield in Carothers v. Follette, 314 F.Supp. 1014, 1023–1024 (S.D.N.Y.1970).

of any communication with a specific individual. It thus presents an example of a "prior restraint" on the plaintiff's freedom of expression—the kind of abridgment that normally receives the closest judicial scrutiny.

Placing the "prior restraint" label on defendant's action does not, however, decide the case; for some kinds of prior restraint have always been tolerated. See Near v. Minnesota, 283 U.S. 697, 716, 51 S.Ct. 625, 75 L.Ed. 1357. I assume that conviction of a crime and imprisonment in a penal institution provide exceptional circumstances which may justify prior restraint in appropriate cases. However, if the vital purposes of the First Amendment are kept in mind, it is equally clear that the state bears the burden of justifying such restraints.

Under the Wisconsin Supreme Court's interpretation of § 53.09, that burden may not be discharged by simple reliance on the statute.

## II.

The relevant regulations do not authorize the action which plaintiff challenges.

The prison regulation of "Mail Privileges" contains three relevant subparagraphs. It is subparagraph (b) which expressly authorizes the withdrawal of outgoing correspondence privileges.[10] The only specified grounds for withdrawal or restriction are "as a disciplinary or security measure." There is nothing in the record to suggest that either of those grounds has any relevance here.

Subparagraph (c) authorizes inspection of all incoming and outgoing mail and, in addition, the nondelivery of particular communications for a variety of reasons, including "propriety, security or the welfare of the institution or inmate." [11] Although the point is debatable, I assume that subparagraph (c) would provide adequate authority for the nondelivery of the letter of November 29, 1970, which precipitated this controversy; however, that subparagraph does not purport to authorize the complete prohibition of communication between an inmate and others. Thus, neither subparagraph (b) nor (c) supports the action at issue.

Subparagraph (a) of the regulation is ambiguous but may be read to authorize the warden to add or subtract names from a list of permissible correspondents

---

10. Subparagraph (b) provides:
"*Limitations.* The number of outgoing letters permitted each week shall be specified by the warden or superintendent. The outgoing correspondence privilege may be withdrawn or restricted as a disciplinary or security measure."

11. The full text of subparagraph (c) is as follows:
"*Mail Inspection.* All incoming and outgoing mail for inmates shall be subject to institution inspection. If an inmate refuses to consent to inspection, he may be denied the privilege of correspondence. All letters received for him may be returned to the sender with a proper notation or held for delivery to the inmate upon release or discharge.
"Letters to or from the Governor, Secretary of the Department of Health and Social Services, Administrator of the Division of Corrections and the members of the Health and Social Services Board are

exempted from such inspection. Communications sent to these correspondents shall have the inmate's name and number plainly written in the upper left hand corner of the envelope. Those letters received from the Secretary of the Department and Administrator of the Division will be initialed in the upper left hand corner of the envelope. In addition, inmates may send mail sealed and without inspection to the Justices of the Supreme Court of Wisconsin or to any Judge of a Court of original or competent jurisdiction.

"At the discretion of the warden, superintendent or designated official, the delivery or dispatch of any inmate correspondence, with the exceptions noted, may be withheld for reasons of propriety, security or the welfare of the institution or inmate. Such correspondence shall be disposed of as the warden or superintendent shall direct, having in mind the best interests of the inmate and the institution."

for any reason whatsoever.[12] The *Thomas* case indicates that such mail privileges have been forbidden for reasons unrelated to discipline, security of the institution or rehabilitation of the inmate; in that case the warden had refused to permit an ex-serviceman to write a letter to the Veterans Administration complaining of inadequate medical care. See 55 Wis.2d at p. 346, 198 N.W.2d 675. Since, however, the Wisconsin Supreme Court's opinion forecloses an interpretation of subparagraph (a) as granting the kind of arbitrary authority that would enable the defendant to withdraw mailing privileges on a selective, completely *ad hoc* basis, I am persuaded that subparagraph (a) affords no more support for defendant than the statute itself.

I therefore conclude that the decision to place Steffes' name on plaintiff's deny list is not supported by the kind of reasonable regulation effectuating legitimate administrative objectives which is required by the State Court's opinion.

### III.

In my opinion, any action which abridges First Amendment rights bears a heavier burden of justification if it implements an *ad hoc* determination rather than a preformulated standard. Guidelines which evidence awareness of the conflicting considerations that should influence particular decisions are presumptively valid.[13] But I am per-

12. Subparagraph (a) provides:
"*Approved Lists.* Each inmate shall be permitted to correspond with approved persons named on the correspondence list prepared at the institution as soon as possible after the time of admission. The list of approved correspondents may be changed or revised with approval of the appropriate officer."

13. Historically, the value of carefully considered standards has been largely ignored in the corrections area because virtually all aspects of corrections were assumed to be committed to the complete discretion of executive appointees. Apparently for the first time in history, on August 23, 1972, the Association of State Correctional Adminitrators adopted recommended uniform standards to guide institutional administrators and personnel. The recommended policy guidelines with respect to mail merit quotation in full:

"Correspondence with members of an inmate's family, close friends, associates, and organizations is beneficial to the morale of all confined persons and may form the basis for good adjustment in the institution and in the community.

"Inmates should be permitted to send sealed letters to a specified class of persons and organizations. Mail to these persons from the inmates should not be opened. Mail from these persons to inmates may be opened for inspection for contraband only. The following persons should be included:

1. Judges of federal, state and local courts.

2. Officials of the confining authority.

3. Members of the paroling authority.

"Approved mail lists for general correspondence may be maintained.

"The criteria for approval of persons for general correspondence should be limited to the purposes of confinement and security of the institution. In general, all close relatives should be approved, anyone having legitimate business with the inmate may be approved, correspondence should not be limited solely on the basis of sex, existence of a criminal record should not, in and of itself, constitute a barrier to correspondence, and juveniles under the age of 18 years should have permission from parents before correspondence is allowed. Other correspondents may be permitted at the discretion of the institutional head.

"An inmate may make changes on his approved list. The number of approved correspondents should be unlimited, and there should be no limitation on the number of letters an inmate may send to or receive from them. Upon request, an individual may be removed from the inmate's mailing list.

"All general correspondence, both incoming and outgoing, may be inspected.

"PUBLICATIONS:

"Institutions should allow inmates access to publications to the greatest degree consistent with institutional goals, internal discipline and security. Publications should be received by inmates only from

suaded that the strong presumption of regularity which normally supports state action, particularly when an exercise of discretionary authority is under attack, is not available to justify the *ad hoc* determination made on behalf of the defendant here.

The issue is nevertheless not easily resolved because there is a reasonable likelihood that the judgment of the experienced social worker who interviewed both plaintiff and Steffes is sound. Certainly I would not presume to characterize it as irrational, even under the test well stated in Judge Pell's opinion. On the other hand, the record does not unambiguously establish a correlation between plaintiff's rehabilitation and the total prevention of communication between plaintiff and the mother of his child. In view of the risks of error inherent in an *ad hoc* determination,[14] unsupported either by preformulated guidelines or by a more complete exposition of the reasons why less drastic alternatives could not be equally effective in achieving a legitimate rehabilitative goal,[15] a fair respect for the rights protected by the First Amendment requires

rejection of defendant's justification on the record developed in the court below. I would therefore affirm Judge Doyle's order of April 6, 1972.

---

the publisher or distributor. In addition, institutions may subscribe to publications in sufficient quantity to give coverage in the institution and to provide for the diverse interests of the inmate population. No publication should be prohibited solely on the basis of its appeal to a particular ethnic, racial or religious audience. As a general rule, however, institutions may restrict receipt of publications that constitute a danger of a breach of prison discipline or security, or some other substantial interference with the orderly administration of the institutions."

14. In *Carothers, supra*, for example, a letter to an inmate's parent criticizing the competence of the prison staff served as the basis for punishment, see 314 F.Supp. at 1024–1026; consider also Wisconsin's refusal to permit correspondence with the Veterans Administration as reflected in *Thomas, supra*.

15. We must both respect the expertise of the correction officers who face these problems daily and also be on guard against the danger that the "rhetoric of rehabilitation" will obscure rather than identify constructive solutions to prison problems. In his illuminating paper on "The Prosaic Sources of Prison Violence," Hans W. Mattick stated (at page 2):

"Much more fundamental is a contradictory complex of utilitarian and religious ideas of 18th and 19th Century origin, which have been slowly debased into a melange of 20th Century 'high school thought,' and now serve as the basis for our penal policy. It is, for the most part, a policy of isolation and punishment, accompanied by the rhetoric of rehabilitation, which results in the chronic underfinancing, inadequate staffing, deflected sexuality, and general lack of resources and poverty of imagination that characterizes our prisons and jails."