Weusi PAKA a/k/a Edward McZeal et al.

v.

John R. MANSON, Commissioner, Department of Correction, State of Connecticut, et al.

Civ. No. H–241.

United States District Court,
D. Connecticut.

Nov. 22, 1974.

Michael Avery, New Haven, Conn., Morton Cohn, West Hartford, Conn., for plaintiffs.

Robert K. Killian, Atty. Gen., Stephen J. O'Neill, Asst. Atty. Gen., Hartford, Conn., for defendants.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge.

This is an action for declaratory and injunctive relief against certain named officials of the Department of Correc-

tion of the State of Connecticut for deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution and laws of the United States. The plaintiffs, who, with the exception of the plaintiff Paka,[1] are presently incarcerated at the Connecticut Correctional Institution at Somers (hereafter, Somers), claim that the defendants and their agents and employees have refused to allow prisoners at Somers to meet for the purpose of forming a "prisoners' union" (hereafter, the union), to solicit membership in the union, or to receive legal mail related to the organization of the union. The plaintiffs also allege that they have been punished for attempting to engage in activities promoting the union and that materials in their possession relating to the union, and to prisoners' unions in general, have been confiscated. A cause of action is stated under 42 U.S.C. § 1983 (1970), and jurisdiction is proper under 28 U.S.C. § 1343(3) (1970).

The plaintiffs claim to represent the class of all prisoners at Somers who seek to organize and join the union. Since the questions of law common to the members of the class predominate over any questions affecting only individual members and the other requirements of rule 23 of the Federal Rules of Civil Procedure are met, this suit is properly maintainable as a class action.

The hearing on the merits required for permanent relief was consolidated with the hearing on the application for a preliminary injunction by agreement of counsel. Fed.R.Civ.P. 65(a)(2).

## I. FACTS

Three basic areas of contention emerge from the pleadings and the evidence. The basic facts material to them were admitted by the defendants in their Answer or were undisputed at the hearing.

---

1. The plaintiff Paka is presently incarcerated at the Connecticut Correctional Center at Montville (hereafter, Montville), having been transferred there from Somers, as will appear.

## A. *Efforts of Prisoners at Somers to Organize the Union*

Early in 1973 several prisoners at Somers began efforts to organize a prisoners' union.[2] The plaintiff Paka wrote to the defendant Robinson, the warden at Somers, asking his position on the proposed union. On July 11, 1973, Warden Robinson wrote in reply that the request was vague and that he needed more information in order to fully evaluate the proposal. During the spring and summer of 1973, when the plaintiffs and others were soliciting support for the union among prisoners at Somers, the defendants and their agents attempted to discourage and prevent the formation of the union. In July 1973 the plaintiff Paka was found in possession of a stencil dealing with the formation of the union. The stencil was confiscated as contraband, and Paka was placed in administrative segregation. Somers officials dealt in a similar manner with Jerry Lee Rosignol, another prisoner who was found in possession of a stencil relating to the union. Also during July 1973, the plaintiff Cofone was placed in the segregation unit for allegedly making statements to other prisoners concerning efforts to organize the union. In subsequent months, prison officials confiscated papers relating to the prisoners' union which were in the possession of other prisoners. In October 1973, Assistant Warden Cybulski told the plaintiff Cofone that permission would not be given for the formation of the union.

## B. *The Transfer of Plaintiff Paka*

The testimony at the hearing indicated that in July 1973, when the plaintiff Paka was put in administrative segregation following confiscation of the contraband stencil, Somers personnel found in his cell a copy of a letter addressed to the local NAACP office. The letter purported to describe a fictional incident on *July 4, 1973,* in which black inmates at Somers "were attacked and locked up like caged animals for wearing their hair in braids and for reading black poetry." The copy of the letter was discovered on *July 3, 1973.* Warden Robinson, fearful that Paka would provoke the imagined incident, kept Paka in administrative segregation for several months. On October 19, 1973, following a hearing, Paka was transferred to the Community Correctional Institution at Montville, Connecticut. Paka individually seeks an injunctive order requiring the defendants to return him to the general prison population at Somers.

This separate additional claim of the plaintiff Paka that his transfer from Somers to Montville violated his constitutional rights may be dealt with summarily. The letter Paka wrote to the NAACP falsely describing a disturbance on July 4, 1973, and the fear of prison officials that Paka would attempt to provoke such a disturbance, provided ample justification for the transfer. "[T]he knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection." Garrison v.

---

2. The nature and structure of the union, although still in the formative stage when prison officials acted to block further activities aimed at bringing it into being, have been sufficiently described for the purpose of delineating issues in this case. That was accomplished by counsel for the plaintiffs when he made the following statement at the beginning of the hearing:

"Now, in the papers which we have filed the association which we are asking for has been continually referred to as the 'prisoners' union.' I would like to make clear to the Court at the outset of the hearing that we are not asking for orders from the Court to establish a National Labor Relations Board-type of labor union in the prison. What we are asking for is simply that the prisoners at the prison be allowed to exercise their First Amendment rights, to discuss things that are of importance to them, to air their grievances, to meet together, to elect representatives and to take their proposals, criticisms, suggestions and the like to the administration." Transcript of Opening Statement by Mr. Avery (Apr. 3, 1974) 2-3.

Louisiana, 379 U.S. 64, 75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964). The record indicates—and Paka does not claim otherwise—that at the time of the transfer Paka received the process which he was due under the Constitution. *See* Newkirk v. Butler, 499 F.2d 1214 (2d Cir. 1974); Sostre v. McGinnis, 442 F.2d 178, 198 (2d Cir. 1971), cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972); Croom v. Manson, 367 F.Supp. 586, 592 (D.Conn.1973); *cf.* Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

## C. *Interception and Censorship of Legal Mail*

In August 1973 Anthony Saia, a prisoner at Somers, contacted Judith Mears, an attorney and at that time Legal Director of the Connecticut Civil Liberties Union, regarding the formation of the union. Saia sent Ms. Mears a proposed set of union goals and a membership form, asking that she make copies of the goals and the form and send them to him. She did so, but the correspondence was opened and read by prison officials. With the exception of one copy which was given to Saia, the materials were sent back to Attorney Mears with the explanation that they were contraband.

In September 1973 Attorney Igor I. Sikorsky, Jr. assisted several Somers prisoners with state habeas corpus proceedings involving the formation of the prisoners' union. On September 4, 1973, Mr. Sikorsky mailed a letter and two copies of *The Outlaw*, a national prisoners' union newspaper, to each of the prisoners. The correspondence was opened and read by prison officials, and the materials were returned to the attorney with the statement that they were considered contraband.

## II. PLAINTIFFS' CLAIMS

The steps taken by the defendants during the course of events that gave rise to this action which are challenged as unconstitutional all stem from the unwillingness of the defendants to tolerate a prisoners' union. But the restraint on communications between the plaintiffs and their counsel, and upon the distribution within the prison of materials relating to a union, raise issues separate and distinct from the question whether the plaintiffs may organize a union and function as an organized group within the prison. This latter issue will be considered first.

## A. *The Union*

The plaintiffs claim that they have a constitutional right to form, join, and conduct a prisoners' union. Their position presents a question novel in this Circuit.[3] This claimed right is allegedly grounded on the first amendment "right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S.Const. amend. I. The "freedom to engage in association for the advancement of beliefs and ideas," NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958), and the "rights to assemble peaceably and to petition for a redress of grievances," UMW v. Illinois State Bar Ass'n, 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L. Ed.2d 426 (1967), are secured against state action by the fourteenth amendment. *See, e. g.,* Elfbrandt v. Russell,

---

3. In Goodwin v. Oswald, 462 F.2d 1237 (2d Cir. 1972), Circuit Judge Smith, in writing for the majority, neatly restricted the court's decision to the issue of the permissible scope of the right of counsel for the prisoners to correspond with inmate clients on the subject of the possibility of organizing an inmate labor organization, and explicitly refrained from considering the issue presented in the instant case: "We are not faced on this appeal with the question of the constitutionality or legality of unions or other organizations of prisoners, but only with the right of prisoners to receive communications from counsel whose advice has been sought on that question. We do not therefore intimate any views as to the legality, desirability, dangers or possible benefits of any type of prisoner collective bargaining on prison working conditions or of any other organized representation of prisoners." *Id.* at 1239.

384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966). The plaintiffs contend that since such associational rights constitute "preferred" constitutional freedoms, prison authorities may curtail their efforts to form and join the union only upon a demonstration of " 'a compelling state interest centering about prison security, or a clear and present danger of a breach of prison security, * * * or some substantial interference with orderly institutional administration.' . . ." Goodwin v. Oswald, *supra*, 462 F. 2d at 1244, *citing* Fortune Soc'y v. McGinnis, 319 F.Supp. 901, 904 (S.D.N.Y. 1970).

 The issue presented by the plaintiffs is an important one and deserves more than cursory analysis. For the sake of clarity it is worth repeating that the petitioners do not seek the right to organize a labor union. More accurately, what they want to form is an organized group of elected representatives of inmates within the prison to meet together, and to take their proposals, criticisms, suggestions and the like to the administration. The first amendment offers broad protection from state interference for persons seeking to associate together for the advancement of their shared interests. Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); UMW v. Illinois State Bar Ass'n, *supra*; Brotherhood of R.R. Trainmen v. Virginia ex rel. Va. State Bar, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed. 2d 89 (1964); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); NAACP v. Alabama ex rel. Patterson, *supra*. However, it is firmly established that first amendment rights are not absolute and that their regulation as to time, manner, and place of exercise is proper when reasonably related to a valid public interest. See, e. g., Pell v. Procunier, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).[4] In order to resolve the problem presented here the Court is therefore required to arrive at a balance between the interest of the prisoners in associating together within an in-prison union and the interest of the state in maintaining internal security within the prison.[5] *See* Pell v. Procunier, *supra*, 417 U.S. at 822, 94 S.Ct. at 2804:

> "We start with the familiar proposition that '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the

4. "In a number of contexts, we have held 'that reasonable "time, place, and manner" regulations [of communicative activity] may be necessary to further significant governmental interests, and are permitted.' Grayned v. City of Rockford, 408 U.S. 104, 115 [, 92 S.Ct. 2294, 2303, 33 L.Ed. 2d 222] (1972); Cox v. New Hampshire, 312 U.S. 569, 575–576 [, 61 S.Ct. 762, 765–766, 85 L.Ed. 1049] (1941); Poulos v. New Hampshire, 345 U.S. 395, 398 [, 73 S.Ct. 760, 762, 97 L.Ed. 1105] (1953); Cox v. Louisiana, 379 U.S. 536, 554–555 [, 85 S.Ct. 453, 464–465, 13 L.Ed.2d 471] (1965); Adderley v. Florida, 385 U.S. 39, 46–48 [, 87 S.Ct. 242, 246–247, 17 L.Ed.2d 149] (1968). 'The nature of a place, the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable.' *Grayned, supra*, 408 U.S. at 116 [, 92 S.Ct. 2294 at 2303] (internal quotations omitted). The 'normal activity' to which a prison is committed—the involuntary confinement and isolation of large numbers of people, some of whom have demonstrated a capacity for violence—necessarily requires that considerable attention be devoted to the maintenance of security. Although they would not permit prison officials to prohibit all expression or communication by prison inmates, security considerations are sufficiently paramount in the administration of the prison to justify the imposition of some restrictions on the entry of outsiders into the prison for face-to-face contact with inmates." 417 U.S. at 826, 94 S.Ct. at 2806.

5. In a somewhat related context the interest balancing method was explained by Mr. Justice Frankfurter, concurring in Dennis v. United States, 341 U.S. 494, 524–525, 71 S. Ct. 857, 875, 95 L.Ed. 1137 (1951): "The demands of free speech in a democratic society as well as the interest in national security are better served by candid and informed weighing of the competing interests, *within the confines of the judicial process*, than by announcing dogmas too inflexible for the non-Euclidian problems to be solved." (Emphasis added.)

considerations underlying our penal system.' Price v. Johnston, 334 U.S. 266, 285 [, 68 S.Ct. 1049, 1060, 92 L. Ed. 1356] (1948). See also Cruz v. Beto, 405 U.S. 319, 321 [, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263] (1972). In the First Amendment context a corollary of this principle is that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law."

### The Interest of the Prisoners

██ In order to balance the interests in this case, it may be useful to identify with more particularity the rights involved which the plaintiffs' "lawful incarceration" has retracted. At stake here are the "political" rights protected by the first amendment: the rights to speak freely and to associate with others for the advancement of shared interests. There are two distinct aspects of the right of association criss-crossing each other that are involved in the union which the plaintiffs seek to organize. One is the interest in associating with others in a group, and the other is in taking group action. With respect to the first of these, the right to associate

with whomever one chooses takes some coloration from the right to privacy. But, as Judge Friendly (formerly Chief Judge) pointed out in Rosenberg v. Martin, 478 F.2d 520, 524–525 (2d Cir.), cert. denied, 414 U.S. 872, 94 S.Ct. 102, 38 L.Ed.2d 90 (1973), "[t]hus far only the most intimate phases of personal life have been held to be thus constitutionally protected." [6] With respect to the second of these rights of association, it must be noted that even for free persons in society at large the right of association is not absolute. See, e. g., Healy v. James, supra, 408 U.S. at 189, 92 S.Ct. 2338; United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 567, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). As pointed out already, it is also true that the right to speak freely is not a constitutional absolute. See note 4 supra and cases cited therein; note 7 infra.

In evaluating whether the seriousness of the deprivation of first amendment rights suffered here invokes these nonabsolute constitutional protections, the Court must heed the teaching that Pell drew from Kleindienst v. Mandel, 408 U.S. 753, 765, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972): where restraints on rights of prisoners to communicate with each other are involved, a court must "regard the available 'alternative means of [communication] . . . [as] a relevant factor' in a case such as this where 'we [are] called upon to balance First Amendment rights against [legitimate] governmental . . . interests.'" 417 U.S. at 824, 94 S.Ct. at 2805.[7] At every

6. Recently in Village of Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), an ordinance banning communal households within a village was upheld as bearing a rational relationship to the permissible state objective of maintaining quiet, uncongested neighborhoods for families in face of the contention that the ordinance resulted in the deprivation of the fundamental rights of association and privacy and therefore required that a "compelling interest" must be shown to justify it.

7. However, it is interesting to note that the Supreme Court carefully avoided stating that

such an analysis must be made to provide a basis for applying the "less drastic means" test. Thus, the narrow standard in Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L. Ed.2d 231 (1960), that a state's restraints on first amendment rights of students in the academic environment of a schoolroom are not constitutionally permissible where "less drastic means for achieving the same basic purpose" are available, id. at 488, 81 S.Ct. at 252, has not been given an across-the-board application. See Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969) (where that rule was applied "in

one of Connecticut's correctional facilities, including Somers, several avenues are open to prisoners for communicating their · suggestions, recommendations, complaints, and grievances to prison officials at every level, including the commissioner. Within the institution the warden and deputy wardens stroll the corridors and conduct interviews. At Somers groups of line officers sit down and enter into dialogues with chosen groups of inmates. Although the members of such inmate groups are deemed by the authorities to be representative of broad segments of the inmate population in the sense that their problems or comments are typical of those throughout the institution, they are not elected by the inmates, but selected by the authorities. Furthermore, there is communication through a concerned correctional ombudsman who reports to the Hartford Institute on Criminal and Social Justice and who was hired by that institute via a contract with the Correction Department. He has complete access to the inmates, staff, and facilities at Somers on a full-time basis. For about six months prior to the hearing he had been taking inmate complaints and suggestions up with the authorities at Somers—with good responses from the prison authorities and considerable success in terms of changes.

To gather inmate feedback, the state has obtained federal funds from the

---

light of the special characteristics of the school environment.")

After noting that " '[t]he relationship of state prisoners and the state officers who supervise their confinement is far more intimate than that of a State and a private citizen,' and that the 'internal problems of state prisons involve issues . . . peculiarly within state authority and expertise.' Preiser v. Rodriguez, 411 U.S. 475, 492 [, 93 S. Ct. 1827, 1837, 36 L.Ed.2d 439] (1973)," the Court laid down a broader standard for testing the constitutionality of restraints on the first amendment rights of *prisoners* to communicate: "So lang [*sic*] as reasonable and effective means of communication remain open . . . we believe that, in drawing such lines, 'prison officials must be accorded great latitude.' " Pell v. Procunier, *supra*, 417 U.S. at 826, 94 S.Ct. at 2806. This is not a radical shift in judicial doctrine. It is merely a reiteration of the principle that "the constitutional limitations on governmental actions differ depending on the role in which the government is acting in a particular case. This is so despite the fact that each situation might involve the same constitutional interest of the affected individuals." Morales v. Schmidt, 489 F.2d 1335, 1342 (7th Cir. 1973) (opinion on rehearing en banc). It is entirely logical that the difference between the classroom, which is "the marketplace of ideas," Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), and the "volatile atmosphere of a prison," *see* Sostre v. Otis, 330 F.Supp. 941, 945 (S.D.N.Y.1971), should call for different degrees of protection. *Cf.* Wolff v. McDonnell, *supra*, 418 U.S. at 556, 94 S.Ct. 2963. So long as the state does not attempt to completely inhibit speech as such, its power to regulate the manner of its exercise must be subjected to a test suitable to the particular context in which the limitation is applied.

The rule that the standard for permissible limitation on the exercise of first amendment rights varies with the community in which it occurs has been applied in another context also. In refusing to hold that Articles 133 and 134 of the Uniform Code of Military Justice are unconstitutional restrictions on first amendment rights of free speech, the Supreme Court recently stated, in Parker v. Levy, 417 U.S. 733, 758, 94 S. Ct. 2547, 2563, 41 L.Ed.2d 439 (1974) :

"While the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission require a different application of those protections. The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it."

There are obvious differences between a prison and a military community, and I am reluctant to press the analogy. Nevertheless, each in some ways is, "by necessity, a specialized society separate from civilian society." *Id.* at 743, 94 S.Ct. at 2555. The rationale for a broader standard for testing limitations on the first amendment rights of prisoners was explained at considerable length in *Pell* in terms of the "institutional considerations, such as security and related administrative problems, as well as the accepted and legitimate policy objectives of the corrections system itself, [which] require that some limitation be placed on such visitations." 417 U.S. at 826, 94 S.Ct. at 2806.

Law Enforcement Assistance Administration, through the Department of Justice, which are being put to constructive use to improve and expand communication between the inmates and the administration. The Department of Correction has contracted with the Prison Association, a statewide citizens group interested in penology, to provide two full-time attorneys who come to Somers solely to represent the inmates in their civil matters—including suits against the Department and its officers.

In considering the amount and quality of speech which is burdened by refusal to permit an in-prison union, the sole curtailment of the plaintiffs' right to take up with prison authorities all of the matters with which the union would be concerned is that this shall not be done by group action. As a general proposition there is a difference between access to prison officials by individual prisoners in order to air their grievances and to take their proposals, criticisms, suggestions, and the like to the administration, and the right to stress them by group action, as the prisoners seek to do through the union. Cf. Whitney v. California, 274 U.S. 357, 372, 47 S.Ct. 641, 71 L.Ed. 1095 (1927). However, none of the prisoners at Somers are cast into outer darkness, forgotten or neglected. It may not be the case, as the Commissioner contends, that the methods of communication which are presently available to the inmates at Somers on an individual basis are actually more effective functionally to achieve the purposes for

which the union is sought than the union itself would be because those methods screen out of prisoners' complaints the distortions and irrelevancies that are sure to be injected by the long-termer "power brokers." The methods of communication between inmates at Somers and its administrators are adequate to give every complaining prisoner a fair opportunity to present to his supervising authorities facts, opinions, and arguments supporting his position on any matter relating to conditions of his confinement.

*The Interest of the Prison Authorities*

To assist the Court in making an analysis of "the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law," the parties offered evidence relevant to a resolution of the conflict between their competing interests. As might be expected, the testimony offered at the hearing stressed differing points of view with respect to the penal objectives discussed by the Supreme Court in *Pell,*[8] particularly with regard to the effect of a prisoners' union on the "central" goal of "internal security within the corrections facilities themselves."

The plaintiffs offered the testimony of two expert witnesses who have studied the functioning of prisoners' organizations in correctional institutions. Donald H. Goff, a sociologist who served as Chief of the Bureau of Corrections for the State of New Jersey from 1955

---

8. In a more than routine analysis, the Court articulated the several state purposes served by imprisoning criminal offenders and the problems such imprisonment presents:

"An important function of the corrections system is the deterrence of crime. The premise is that by confining criminal offenders in a facility where they are isolated from the rest of society, a condition that most people presumably find undesirable, they and others will be deterred from committing additional criminal offenses. This isolation, of course, also serves a protective function by quarantining criminal offenders for a given period of time while, it is hoped, the rehabilitative processes of the corrections system work to correct the offender's demonstrated criminal proclivity. Thus, since most offenders will eventually return to society, another paramount objective of the corrections system is the rehabilitation of those committed to its custody. *Finally, central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves.* It is in the light of these legitimate penal objectives that a court must assess challenges to prison regulations based on asserted constitutional rights of prisoners." 417 U.S. at 822, 94 S.Ct. at 2804 (emphasis added).

to 1960 and is a consultant on prisons to the United States Commission on Civil Rights, testified that "inmate councils" which have been organized in prisons in several states have yielded a number of significant benefits for inmates and prison officials, including improved access for inmates to prison administrators for the presentation of specific grievances, reduced racial tensions within the institutions, and increased variety of suggestions for improvement of educational, recreational, cultural, and industrial facilities at the institutions. Mr. Goff testified that he believed that neither meetings of prisoners within Somers nor election of inmate representatives from the prisoner population would necessarily pose a clear and present danger to the security of the institution. Mr. Goff admitted on cross-examination that he had not spoken to the plaintiffs in this case, nor had he been to the prison at Somers.

The plaintiffs also offered the testimony of Larry Schwartz, who currently works as a corrections consultant for the Providence Corporation, a nonprofit social action agency in Providence, Rhode Island. Mr. Schwartz was one of the founders of the National Prisoners Reform Association (hereafter, NPRA), an association of inmates, ex-inmates, and other interested persons which was organized in 1972 for the purpose of improving conditions in the Rhode Island Adult Correctional Institution. Mr. Schwartz is a member of the NPRA board of directors and has been closely involved in the development of the organization. He testified that NPRA is a representative organization, with duly elected representatives serving as spokesmen for the members. The entire organization meets as a body four times a year, and the representatives meet weekly or more often. NPRA has an office with a full staff in the state prison facility. NPRA representatives meet with the warden weekly and have been instrumental in resolving various types of inmate problems. The organization was said to have not occasioned any disruptions or threats to prison security. Indeed, when other inmates at the prison took several hostages a year ago in a confrontation with prison authorities, it was members of NPRA who dealt with the rebellious prisoners and negotiated the freeing of the hostages. NPRA administers manpower training grants within the prison for the United States Department of Labor. The grant last year was in the amount of $65,000. Mr. Schwartz stated that he had been to Somers once, as a visitor.

In support of a less optimistic view of the value of a prisoners' union, and with a different estimate of the effect such a union would have on prison security, the defendants offered the testimony of several state prison officials, principally Carl Robinson, the warden at Somers, and John R. Manson, Commissioner of the Connecticut Department of Correction. At the time of the hearing, Warden Robinson had been the warden at Somers for 17 months. He testified in some detail regarding the discovery, on July 3, 1973, of the letter from the plaintiff Paka to the NAACP in which Paka purported to describe mistreatment of black prisoners on July 4, 1973. He was greatly concerned that Paka might actually provoke a confrontation between prisoners and guards and that Paka's behavior might have a severely deleterious effect on racial attitudes and tensions within the prison. He was of the opinion that in view of the violent history of some of the Somers inmates, collective meetings of prisoners within the prison for the purpose of establishing a prisoners' union would constitute a threat to the security of the institution.

Commissioner Manson was strongly opposed to the formation of a prisoners' union at Somers. Based upon his experience as commissioner and his observations of the situation at Somers, he pointed to two basic dangers which he considered a union would present to prison security and discipline. First, he was of the opinion that inmates serving long sentences would exert undue influence over short-term prisoners and

would act as self-appointed "power brokers"[9] in negotiations with prison officials. Somers is the maximum security prison in the State of Connecticut and contains a higher proportion of "violence cases" than the other detention institutions. Every one of the named plaintiffs in this case are serving long terms, and some may be there for the rest of their lives.[10] The typical inmates, who comprise about 90% of the prison population, usually spend no more than 12 months in the prison. In contrast to the long-termers, who have little to lose by being obstreperous, these typical inmates, are especially cooperative and well-behaved in order not to jeopardize their privilege of earning good time and obtaining early release.[11] Their principal interest is to get out as quickly as possible. Because of this difference in the objectives of the two groups, the Commissioner feared not only a distortion of any system of elected representatives in a union, but also the use of pressure, physical coercion, and intimidation against short-term prisoners in the organization or operation of a union. While there is no sure way to predict the behavior of prisoners, that there is a valid basis for such fears has been explicitly recognized by the Court in Wolff v. McDonnell, *supra*.[12] Manson was of the opinion that the effect of collective

9. An explanation of the internal covert system of bribes and coercion underlying the power-broker system and how it works may be found in Note, Bargaining in Correctional Institutions: Restructuring the Relation Between the Inmates and the Prison Authority, 81 Yale L.J. 726 (1972).

10. Standing alone, the fact that long sentences have been imposed on certain prisoners is indicative of judicial assessments that they have demonstrated noticeable tendencies to act with violence toward others and that the need to protect society from them requires their long-term incarceration.

11. Good time credits entitle a prisoner "to early release regardless of anyone's judgment as to his potential for living a law-abiding life in the community." *Cf.* United States ex rel. Miller v. Twomey, 479 F.2d 701, 714 n. 27 (7th Cir. 1973), cert. denied, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974).

12. "Prison disciplinary proceedings, on the other hand, take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so. Some are first offenders, but many are recidivists who have repeatedly employed illegal and often very violent means to attain their ends. They may have little regard for the safety of others or their property or for the rules designed to provide an orderly and reasonably safe prison life. Although there are very many varieties of prisons with different degrees of security, we must realize that in many of them the inmates are closely supervised and their activities controlled around the clock. Guards and inmates co-exist in direct and intimate contact. Tension between them is unremitting. Frustration, resentment, and dispair [*sic*] are commonplace. Relationships among the inmates are varied and complex and perhaps subject to the unwritten code that exhorts inmates not to inform on a fellow prisoner.

"It is against this background that disciplinary proceedings must be structured by prison authorities; and it is against this background that we must make our constitutional judgments, realizing that we are dealing with the maximum security institution as well as those where security considerations are not so paramount. The reality is that disciplinary hearings and the imposition of disagreeable sanctions necessarily involve confrontations between inmates and authority and between inmates who are being disciplined and those who would charge or furnish evidence against them. Retaliation is much more than a theoretical possibility; and the basic and unavoidable task of providing reasonable personal safety for guards and inmates may be at stake, to say nothing of the impact of disciplinary confrontations and the resulting escalation of personal antagonism on the important aims of the correctional process." Wolff v. McDonnell, *supra*, 418 U.S. at 560, 94 S.Ct. at 2977.

Although the Court's decision in *Wolff* that it was within the discretion of prison authorities to deny an inmate the highly valued right of confrontation and cross-examination of witnesses adverse to him in a disciplinary hearing (despite his contention that the denial violated his constitutional rights to due process) involved a constitutional guarantee different from the one at issue in the instant case, there is in each case a common denominator—the risk to prison security. While the resentment harbored by a prison-

efforts among prisoners to organize such a union would impair the physical security within the prison. He specifically referred to past incidents of violence at the prison and the letter to the NAACP written by the plaintiff Paka.

This Court is well aware of past incidents of violence involving prisoners at Somers directed against fellow inmates and guards, see Croom v. Manson, *supra*; Hart v. Robinson, Civ.No. 15,558 (D.Conn. Jan. 31, 1973); Roberts v. MacDougall, Civ.No. 14,414 (D.Conn., filed May 20, 1971),[13] and our Court of Appeals has noted that "[t]he authoritarian 'boss' inmate is no chimera." Sostre v. McGinnis, *supra*, 442 F.2d at 202 n.47.

That the possibility of violence is a continuous condition of prison life was also recognized in United States ex rel. Miller v. Twomey, *supra*, 479 F.2d at 717. The fears of Warden Robinson and Commissioner Manson are not unfounded. While it is not yet possible to make accurate predictions of future behavior of prisoners,[14] experience does count for something.

### The Balance of Interests

In balancing the competing interests developed above, this Court is bound by the teachings of *Pell*:[15] "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations [of institutional security]" and "[s]o lang [*sic*] as reasonable and effective means of communication remain open . . . 'prison officials must be accorded great latitude.' Cruz v. Beto, *supra*, [405 U.S.] at 321 [, 92 S.Ct. 1079 at 1081, 31 L.Ed.2d 263]." 417 U.S. at 826, 94 S.Ct. at 2806.

■■ Additional guidance in making an analysis of whether the restriction challenged in this case is inconsistent with the plaintiffs' status as prisoners may be derived from other cases adjudicating the legality of restraints on the associational rights of prisoners. In upholding the dismissal of a prisoner's ac-

---

er defeated in an election may not necessarily be of the same intensity as that of one disciplined for violation of prison rules, the circumstances under which it may be generated would make the judgment of the defendants that it would also generate the risk of reprisal within the institution, *id.*, not unreasonable.

13. Presently pending in this Court is a diversity suit by a former inmate against the prison administrators seeking substantial damages for serious injuries which he sustained as a result of their alleged failure to safeguard him from the violence of his fellow inmates. See Scittarelli v. Manson, Civ. No. H–74–163 (D.Conn., filed May 21, 1974). *Cf.* Muniz v. United States, 305 F.2d 285 (2d Cir. 1962), aff'd, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963).

14. Even parolees, who have been subjected to clinical study by professionals, and whose records have been reviewed by parole boards, have been known to commit new crimes of violence soon after release.

15. No greater reason is discernible here for adhering to a more stringent method of interest balancing than in *Pell*, where the Court rejected the contention of inmates that a prison regulation which provided that "[p]ress and other [news] media interviews with specific individual inmates will not be permitted" violated their first and fourteenth amendment rights, and also the contention of members of the press that they had "a constitutional right to interview any inmate who is willing to speak to them, in the absence of an individualized determination that the particular interview might create a *clear and present danger to prison security* . . . ." 417 U.S. at 829, 94 S.Ct. at 2807 (emphasis added). *Cf.* Note, The Speech and Press Clause of the First Amendment as Ordinary Language, 87 Harv.L.Rev. 374, 375 n.4 (1973).

Although it has frequently been noted in the cases that "it is well established that prisoners do not lose all their constitutional rights and that the Due Process and Equal Protection Clauses of the Fourteenth Amendment follow them into prison and protect them there . . . ." Washington v. Lee, 263 F.Supp. 327, 331 (M.D.Ala.1966), aff'd per curiam, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968), it is equally settled "that correctional authorities have wide discretion in matters of internal prison administration and that reasonable action within the scope of this discretion does not violate a prisoner's constitutional rights." *See* Smith v. Schneckloth, 414 F.2d 680, 681 (9th Cir. 1969), and cases cited therein.

tion alleging that his right to privacy was violated by monitoring his conversations with prisoners, the court in Christman v. Skinner, 468 F.2d 723, 726 (2d Cir. 1972), quoted from Lanza v. New York, 370 U.S. 139, 143, 82 S.Ct. 1218, 1221, 8 L.Ed.2d 384 (1962), " 'that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room.' " Protection of privacy does not extend to the inmates of a prison confined there after a due process determination that they have violated criminal laws. Conviction of crime carries not only loss of liberty, but also other impairments associated with membership in a closely supervised prison community. The range of free activity for prisoners within the prison is relatively small. Absent conditions so flagrantly unhygienic and dangerous to a prisoner's health as to amount to conditions "below the irreducible minimum of decency required by the Eighth Amendment," LaReau v. MacDougall, 473 F.2d 974, 978 (2d Cir. 1972), cert. denied, 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973); cf. Wright v. McMann, 387 F.2d 519 (2d Cir. 1967), even the solitary confinement of a prisoner within the prison population does not amount to a deprivation of a constitutional right to associate with fellow prisoners. Ford v. Board of Managers, 407 F.2d 937 (3rd Cir. 1969); Graham v. Willingham, 384 F.2d 367 (10th Cir.), aff'g 265 F.Supp. 763 (D.Kan.1967); Siegel v. Ragen, 180 F.2d 785 (7th Cir.), cert. denied, 339 U.S. 990, 70 S.Ct. 1015, 94 L.Ed. 1391 (1950); United States ex rel. Pope v. Hendricks, 326 F.Supp. 699 (E.D.Pa. 1971); Roberts v. Barbosa, 227 F.Supp. 20 (S.D.Cal.1964).[16] Despite the promi-

nence of the right of association among the constitutional rights enjoyed by citizens, it is clear that a convicted felon, even after he has been released from prison on parole, may have substantial restrictions placed upon his associational relations with other persons. Cf. Morrissey v. Brewer, 408 U.S. 471, 478, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). In illustrating the extent to which a parolee's liberty may be curtailed, the court in Hyser v. Reed, 115 U.S.App.D.C. 254, 318 F.2d 225, 239 (Burger, J.), cert. denied, 375 U.S. 957, 84 S.Ct. 446, 11 L. Ed.2d 315 (1963), said: "The United States cannot constitutionally impair a citizen's right to leave the District of Columbia or frequent pool halls, but it can do so to Hyser and the other appellants [parolees], whose freedoms have been substantially abridged in accord with the requirements of due process." See also Birzon v. King, 469 F.2d 1241, 1243 (2d Cir. 1972), upholding the constitutionality of a parole provision that the parolee shall not associate with persons who have a criminal record unless he has permission of his probation officer. Nor shall he associate with persons engaged in criminal activity.[17] The freedom to worship collectively which is an associational right explicitly protected by the free exercise clause of the first amendment, United States v. Ballard, 322 U.S. 78, 86, 64 S.Ct. 882, 88 L. Ed. 1148 (1944); Minersville School Dist. v. Gobitis, 310 U.S. 586, 593, 60 S. Ct. 1010, 84 L.Ed. 1375 (1940), may be curtailed if it threatens prison discipline or security, Sharp v. Sigler, 408 F.2d 966 (8th Cir. 1969); Sostre v. McGinnis, 334 F.2d 906, 908 (2d Cir.), cert. denied, 379 U.S. 892, 85 S.Ct. 168, 13 L.

16. Davis v. Lindsay, 321 F.Supp. 1134 (S.D. N.Y.1970), cited by the plaintiffs as authority to the contrary, is inapposite. In that case the plaintiff was not a convicted felon but was only being held "in custody . . . pending the outcome of extradition proceedings brought by the State of California, which has charged her with kidnapping and homicide." Id. at 1135.

17. And it has been held that evidence seized by a parole officer during a search of a pa-

rolee's living quarters under an administrative arrest warrant issued without the probable cause necessary to justify a warrant under the fourth amendment was admissible, not only to justify revocation of his parole, but also at a trial in a new prosecution for violation of the narcotics laws. United States ex rel. Randazzo v. Follette, 282 F. Supp. 10 (S.D.N.Y.1968), aff'd, 418 F.2d 1319 (2d Cir. 1969), cert. denied, 402 U.S. 984, 91 S.Ct. 1672, 29 L.Ed.2d 150 (1971).

Ed.2d 96 (1964); Knuckles v. Prasse, 302 F.Supp. 1036, 1057–1058 (E.D.Pa. 1969), cert. denied, 403 U.S. 936, 91 S.Ct. 2262, 29 L.Ed.2d 717 (1971).

Although the diverse activities consisting of "freedom of speech . . . peaceably to assemble, and to petition the Government for a redress of grievances," U.S.Const. amend. I, are all designed to enable a citizen to equip himself to exercise his judgment in casting his ballot, nevertheless one convicted of a felony may be wholly deprived of the basic right to vote even though he has served his sentence. *See* Richardson v. Ramirez, 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974); Green v. Board of Elections, 380 F.2d 445 (2d Cir. 1967), cert. denied, 389 U.S. 1048, 88 S.Ct. 768, 19 L.Ed.2d 840 (1968). It would seem to be a dubious contention that a convicted felon who can constitutionally be deprived of his franchise even after he has fully served his sentence is nonetheless entitled to constitutional protection of a right to have his vote as a prisoner

weighed in a democratic process determining what programs and activities shall be permitted among the prisoners. And, perhaps more relevant to the instant case, a former felon may be constitutionally barred from holding office in a union. DeVeau v. Braisted, 363 U.S. 144, 157–159, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960).

In light of these precedents and the analysis of the competing interests involved in this case, the Court cannot find for the plaintiffs here. Concededly the plaintiffs' associational and speech interests may be abridged by denial of the right to organize. On the other hand, this abridgement is slight and must be weighed against the interest of the state in the internal security of its prisons.[18] The Court concludes that the state's interest predominates and that the Commissioner's refusal to permit the organization and operation of a prisoners' union within the prison at Somers does not unconstitutionally restrain any rights of the plaintiffs.[19]

18. While it could be said that the large-scale group action will result in a more effective exposition of "criticisms, suggestions and the like" than individual face-to-face discussions, by using the word "union" the plaintiffs seem to suggest that its success is thought to depend on the potential disruption it would be able to inflict within the institution. With no economic power, union militancy would be its only realistic basis for strength. *Cf.* Goodwin v. Oswald, *supra,* 462 F.2d at 1248–1249 & n.2 (Friendly, C. J., dissenting) (the relationship of an inmate to the prison authorities is not that of an employee to an employer).

19. The case presented here is clearly distinguishable from National Prisoners Reform Ass'n v. Sharkey, 347 F.Supp. 1234 (D.R.I. 1972), and Butler v. Preiser, 380 F.Supp. 612 (S.D.N.Y.1974), upon which the plaintiffs rely. In *Sharkey* the prisoners had been given permission by the warden of the prison to meet for the purpose of organizing the union. The warden himself attended the first formal meeting of the group. The federal suit was initiated as a result of a peremptory order issued by John Sharkey, the assistant director for corrections of the Rhode Island Department of Social and Rehabilitative Services, prohibiting the group from meeting. The warden of the prison

himself did not consider the group to pose a threat to the security of the prison. 347 F. Supp. at 1236. Moreover, the members of the organization had demonstrated their ability to handle substantial responsibility. They included the president and vice-president of the Afro-American Society, the editor and assistant editor of *The Challenge* (presumably a prison newspaper), and the president and vice-president of the Jaycees.

Similarly, in *Butler,* which involved solicitations among prisoners for the Attica Brothers Defense Fund, there was no factual basis for prison officials' fears that the inmate activity would threaten the security of New York prisons. The prison officials sought to justify the peremptory prohibition on solicitations by claimed coercion " 'by one inmate upon another to transfer money without his initiation nor [*sic*] his own free volition * * * ' " 380 F.Supp. at 614. The court, however, took a dim view of this argument:

"There are no recorded instances of trouble, coercion, violence, or any disruption of discipline resulting from solicitations. This statement is not too broad, even allowing for the limits upon judicial proof. The claim of coercion, or fear of coercion, has been central in this case from the beginning. It has been the subject of pointed inquiries from the court to

## B. *Equal Protection*

Although the plaintiffs assert that there are equal protection aspects of this case, they do not provide any articulated analysis of them, leaving the Court to depend largely on guesswork.

■ One possible claim is that the state has differentiated between prisoners and nonprisoners in that it has denied the right to organize to only the former group. This claim may be an ingenious, roundabout way of laying a foundation for the argument that the state must show a "compelling state interest" to justify such a differentiation, for fundamental rights of speech and association are involved. *Cf.* San Antonio Indep. School Dist. v. Rodriguez, 411 U. S. 1, 17, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); Doe v. Norton, 365 F.Supp. 65, 78–82 (D.Conn.1973), prob. juris. noted sub nom. Roe v. Norton, 415 U.S. 912, 94 S.Ct. 1406, 39 L.Ed.2d 466 (1974). While the attempt is intriguing, it is not wholly convincing. The well-reasoned opinion in Morales v. Schmidt, 489 F.2d 1335 (7th Cir. 1973), aff'd on rehearing en banc, 494 F.2d 85 (1974), is persuasive that the state need not show a compelling state interest to differentiate between prisoners and nonprisoners.[20] Even if this heavy standard were applied, however, adherence to the consistent point of view by the Court that, "[f]inally, central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves,"[21] would fully justify classifying the state's interest in preventing formation of a prisoners' union as "compelling."

■ Another possible equal protection claim is that if certain group activities are permitted within a prison, then it is arbitrary and capricious not to permit inmates to engage in any other kind of group activity they may choose. However, organizations like the Jaycees which are allowed to meet within the prison have functions which are different from those of the proposed union. The Jaycees at Somers conduct charity drives and assist in maintaining the canteen. The specific purpose of the proposed union is to bring to the surface, for collective action, grievances and complaints of the prisoners. The restriction on a state not to deny equal protection does not leave it without permission "to recognize degrees of harm" and to "confine its restrictions to those classes of

defendants. An able and imaginative Assistant Attorney General, with ample time for the attempt, has not produced a single example from experience to ground the alleged fear.

"To the contrary, the evidence reflects that solicitations have been peaceable and have varied in their effectiveness. Inmates have responded negatively as well as positively to appeals for support. It is not excessively naive, even for a judge, to credit the evidence that goes far to destroy defendants' thesis." *Id.* at 615.

The Court notes that both cases (1) were decided before *Pell*, (2) were found to involve no threat to internal prison security, (3) involved the retraction of rights previously extended rather than a refusal to extend further privileges.

20. In that case it was held that the state need not show a compelling interest in order to restrain a prisoner's first amendment right to correspond with his wife's sister, by whom he had illicitly fathered a child. Chief Judge Swygert in a separate concurring opinion on rehearing did not agree that the appropriate standard would require only "that the State must show on challenge that such restriction [of first amendment rights] is related both reasonably and necessarily to the advancement of a justifiable purpose of imprisonment." 494 F.2d at 88. Instead he said, "I would add to Judge Pell's formulation by requiring the State to assume a heavy burden of justification. This, in my opinion, would require that prison officials demonstrate the restriction is not only reasonable but there is a substantial necessity for it. This more forceful standard would be less than a compelling State interest but clearly more than a rational relationship between the restriction and prison discipline and rehabilitation." 494 F.2d at 88. *See* Gunther, The Supreme Court, 1971 Term, Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1 (1972).

21. Pell v. Procunier, *supra*, 417 U.S. at 822, 94 S.Ct. at 2804.

cases where the need is deemed to be clearest." Minnesota ex rel. Pearson v. Probate Court, 309 U.S. 270, 275, 60 S. Ct. 523, 526, 84 L.Ed. 744 (1940). *See* Snell v. Wyman, 281 F.Supp. 853, 865 (S.D.N.Y.1968), aff'd per curiam, 393 U.S. 323, 89 S.Ct. 553, 21 L.Ed.2d 511 (1969); *cf.* Buck v. Bell, 274 U.S. 200, 208, 47 S.Ct. 584, 71 L.Ed. 1000 (1927). Being allowed to participate in a permitted kind of group activity is not to be equated with participation in making the determination of what group activities shall be permitted. The nature of the organization of the proposed union, and its contemplated purpose of direct participation with prison authorities in shaping administrative policy, provides a reasonable basis for distinguishing the activities of the proposed union from the kind of inmate participation afforded in the Jaycee program.

This is not to say that prisons in the United States are not plagued with serious, complex, and difficult problems, or that substantial efforts, by individuals, groups, and the federal and state governments, by those within the prison and by those on the outside, are not needed to begin to resolve some of those problems. As Mr. Chief Justice Burger has stated, " '[i]f we want prisoners to change, public attitudes toward prisoners and ex-prisoners must change. . . . A visit to most prisons will make you a zealot for prison reform.' W. Burger, 'For Whom the Bell Tolls,' pp. 9–11 (Remarks before the Assn. of the Bar of the City of New York, N.Y., Feb. 17, 1970)," quoted in Pell v. Procunier, supra, 417 U.S. at 830 n. 7, 94 S.Ct. at 2808 n. 7. There is also abundant persuasive expression of the view that a union would lessen rather than exacerbate tensions between inmates and the prison administration. *See, e. g.,* Goodwin v. Oswald, *supra,* 462 F.2d at 1245–1246 (Oakes, J., concurring). However, the simple and understandable demand that prisons should be better managed is plainly a question of method, and prison administrators must be allowed to decide these difficult practical and philosophical questions of policy.[22] As Judge Friendly observed in the course of his dissent in *Goodwin,*

> "Although the task of line-drawing inevitably remains, federal judges should keep in the forefront of their minds, when passing on the acts of government officials, that they have not been vested with executive or legislative power rather than rush to impose their supposedly superior knowledge, on all sorts of questions, upon the duly appointed officials who have lived with the problems and have been given responsibility to deal with them. Failure to observe such self-limitation will ultimately have most serious consequences." 462 F.2d at 1251.

### C. *Correspondence with Counsel*

Whether the right of association guarantees the right of prisoners to organize and function as a union within the prison presents a different question than whether they have a right to communicate with counsel about the possibility of organizing some kind of a prisoners' union. This latter issue, to be considered here, arose because of the defendants' sweeping restriction against any communication whatsoever regarding the proposal to organize the union.

---

22. In citing to many more legal periodicals than those cited below, the court in Morales v. Schmidt, *supra,* 489 F.2d at 1338 n.4, cogently observed: "The complexities of non-frivolous civil rights suits by prisoners have inhibited few legal commentators." *See generally* National Advisory Committee on Criminal Justice Standards and Goals, Corrections (1973); Greenberg & Stender, The Prison as a Lawless Agency, 21 Buff.L. Rev. 799 (1972); Hirschkop & Millemann, The Unconstitutionality of Prison Life, 55 Va.L.Rev. 795 (1969); Singer, Privacy, Autonomy, and Dignity in the Prison: A Preliminary Inquiry Concerning Constitutional Aspects of the Degradation Process in our Prisons, 21 Buff.L.Rev. 669 (1972); Singer, Prison Conditions: An Unconstitutional Roadblock to Rehabilitation, 20 Cath.U.L. Rev. 365 (1971); Comment, Labor Unions for Prison Inmates: An Analysis of a Recent Proposal for the Organization of Inmate Labor, 21 Buff.L.Rev. 963 (1972).

To resolve this issue necessitates a return to Goodwin v. Oswald, *supra,* to determine what actually was decided in that case. In *Goodwin* the court held that correspondence between counsel and inmates relating to the possible formation of a prisoners' union falls within the scope of legal questions concerning which they may communicate with each other.[23] 462 F.2d at 1243. This Court is foreclosed from making a different assessment. *See, e. g.,* Lewis v. Rockefeller, 431 F.2d 368, 371 (2d Cir. 1970). Thus I reject the defendants' position that if the inmates have no right to associate as a functioning union they should not have the right even to communicate with counsel about it.

The defendants also maintain that to allow literature into prison which holds out the prospect that the formation of unions such as is requested in this case will be permitted when such unions are not allowed will only lead to a strong psychological set-back to interested inmates with adverse effects upon morale throughout the entire inmate population.[24] The defendants make no claim that the physical security of the prison was endangered by the materials concerning prisoners' unions mailed by Attorneys Mears and Sikorsky. The materials themselves, particularly the copies of *The Outlaw,* cannot even remotely be considered to constitute "advocacy . . . directed to inciting or

23. In *Goodwin,* which was decided before Wolff v. McDonnell, *supra,* came down, Judge Smith said that the scope of permissible legal advice extends to "trying to establish a right, possibly derived from the first and thirteenth amendments, for the prisoners to associate and try to lessen the harshness of prison work conditions and contribute to the success of training and rehabilitation programs." 462 F.2d at 1243.

The plaintiffs have argued that the same constitutional basis which underlies their right to communicate with counsel about the possibility of organizing such a union should be applied for testing their right to act as a union. But, while *Goodwin* has a certain relevance, the problems presented are not the same. As Judge Friendly pointed out in Wahba v. New York Univ., 492 F.2d 96, 100 (2d Cir. 1974), cert. denied, 419 .U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974), "we do not find decisions dealing with one form of state involvement and a particular provision of the Bill of Rights at all determinative in passing upon claims concerning different forms of government involvement and other constitutional guarantees." Different state involvements and different constitutional guarantees are presented, and different standards apply.

24. In *Goodwin,* inmates at Green Haven, a maximum security institution at Stormville, New York, began to organize a union within the prison during the summer of 1971. They contacted the Legal Aid Society's Prisoners' Rights Project for assistance. Legal Aid attorneys drew up a proposed constitution for the union and sent it to the inmates. The subsequent events were summarized as follows by the Court of Appeals:

"The communication which is the subject of this suit was sent by Legal Aid during the week of February 7, 1972 to all those inmates who had signed up as members of the union but to no one else. In the packet sent to each inmate the main document was a seven-page letter detailing legal steps being taken on behalf of the union and giving legal advice on a number of union matters. A copy of the letter to the Commissioner requesting recognition of the union, the union constitution, and press releases issued February 7 announcing the formation of the union and commitments of support for it by prominent individuals, were included. On February 9, the Commissioner told Legal Aid that he would deny recognition to the union; a week later he informed the Society that he had not and would not deliver the February 7 letters to the 980 addressees. Apparently, fifteen of the letters had arrived unsealed and were examined by prison officials; on the basis of this scrutiny the authorities had decided to withhold the letters." 462 F.2d at 1239.

The defendant prison officials sought to justify their action with arguments similar to those advanced by the defendants herein:

"The defendants argued that their action was justified because the formation of a union was against prison policy and would jeopardize their control of the institution. They interpreted the letter as a declaration that the union was 'operational' and as an incitement to 'concerted activity' that would present a clear and present danger of disruption to the institution. They anticipated that if the letters were delivered, and they were then obliged to burst the balloon of rising expectations by proscribing union activity, they would subject themselves to danger." 462 F.2d at 1240.

producing imminent lawless action and . . . likely to incite or produce such action." Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969). The issues of *The Outlaw,* the so-called "Journal of the Prisoners Union," contain, in addition to articles urging the formation of prisoners' unions, reprints of newspaper articles, letters from public officials, and court opinions of interest to prisoners, as well as poetry written by prisoners and letters from inmates. The interception and censorship of the materials was pursued by the prison officials solely as part of their policy of discouraging the formation of the union. In passing on the rights of prison inmates "to receive communications from counsel whose advice has been sought," Goodwin v. Oswald, *supra,* 462 F.2d at 1239, the court recognized that such mail may be intercepted if the state shows that it constitutes a clear and present danger to the security of the institution. 462 F.2d at 1244. The court went on to state: "A standard for such danger in a prison context has been set forth in Fortune Society v. McGinnis, [319 F.Supp. 901, 904 (S.D.N.Y.1970)], with which we agree: that in order to justify official interference, the state must show 'a compelling state interest centering about prison security, or a clear

and present danger of a breach of prison [discipline,] or some substantial interference with orderly institutional administration.'" The spirit of discontent which will rage in the breasts of the inmates arising from their "disappointment with resultant loss of morale" which the defendants fear in the instant case is clearly insufficient to justify a total ban on prisoners' mail relating to the union. *See* Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).[25] Thus the interception and censorship of mail relating to a prisoners' union by the defendants violated principally the plaintiffs' fourteenth amendment right of access to the courts. *See* Goodwin v. Oswald, *supra,* 462 F.2d at 1241.[26]

A nicer issue is whether counsel may send into the prison stencils or multiple copies of materials relating to organization of the union. Stencils or multiple copies of such materials could only have been intended for distribution among inmates within the prison and as a tool towards organization of the union that I have already held may be properly prohibited by the prison authorities. To the extent that multiple copies necessarily imply distribution to a group, they involve different risks to the security of the institution than the individu-

25. "Applying the teachings of our prior decisions to the instant context, we hold that censorship of prisoner mail is justified if the following criteria are met. First, the regulation or practice in question must further an *important or substantial governmental interest unrelated to the suppression of expression.* Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless

be invalid if its sweep is unnecessarily broad. This does not mean, of course, that prison administrators may be required to show with certainty that adverse consequences would flow from the failure to censor a particular letter. Some latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty. But any regulation or practice that restricts inmate correspondence must be generally necessary to protect one or more of the legitimate governmental interests identified above." 416 U.S. at 413–414, 94 S.Ct. at 1811 (footnote omitted).

26. For a perceptive analysis of the *Goodwin* court's reliance on the fourteenth amendment right of access to the courts, see 86 Harv.L.Rev. 1607 (1973). *Cf.* Wolff v. McDonnell, *supra,* 418 U.S. at 576, 94 S.Ct. 2963.

al prisoner reading the by-laws of a prisoners' union in his cell. *Compare* Stanley v. Georgia, 394 U.S. 557, 89 S. Ct. 1243, 22 L.Ed.2d 542 (1969), *with* United States v. Reidel, 402 U.S. 351, 355–356, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971). It is true, of course, that both activities look towards a goal which has been properly prohibited—the formation of a prisoners' union.[27] However, the activity that involves distribution to a group raises much more forcefully the risks of agitation and unrest that prison administrators may legitimately seek to combat.[28] *Goodwin* does not control prison officials' ban on mail from counsel consisting of stencils or multiple copies of materials concerning organization of the union. That decision did not purport to address the issue of whether prison officials could prohibit collective activity within the prison for the purposes of organizing a union, when such activity would threaten prison security.

■ There were no constitutional violations in the prison's decision to confiscate the stencils and multiple copies of union materials sent into the prison by Attorneys Mears and Sikorsky. On the other hand, following *Goodwin*, I hold that the interception and censoring by the defendants and their agents of materials concerning prisoners' unions, sent by an attorney to an individual inmate at Somers for whom he is acting as counsel, upon individual request, constituted a violation of the inmates' rights of access to the courts under the fourteenth amendment. The defendants are therefore enjoined from intercepting or censoring materials regarding prisoners' unions sent to inmates at Somers by their attorneys, except insofar as such materials are duplicated printed materials or other materials clearly intended for further distribution among other inmates, in accordance with this memorandum of decision.

The opinion herein constitutes the Court's findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

So ordered.

27. Certainly an attorney may not invoke constitutional protection for an inmate to circulate petitions or other duplicated printed material within the prison simply by sending them to an inmate in an envelope bearing the attorney's office letterhead. The Supreme Court has not yet extended the sixth amendment or the fourteenth amendment's due process protection to an attorney-client relationship concerning civil matters beyond what is necessary for "protecting the ability of an inmate to prepare a petition or complaint." *See* Wolff v. McDonnell, *supra*, 418 U.S. at 576, 94 S.Ct. at 2984. By permitting himself to be used as a union organizer, an attorney steps outside the confidential and advisory aspects of the safeguarded area of the attorney-prisoner relationship.

28. In a broad sense, the right to receive written advice from counsel and the right to pass a copy of that advice on to a fellow prisoner seem to merge, but the Supreme Court has noted that a distinction which may be made is that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). The governmental interest in prison security and the extent of the limitation on first amendment freedoms has already been discussed, and that discussion need not be repeated here.